396 July 16, 2026 No. 31

IN THE SUPREME COURT OF THE
STATE OF OREGON

Stanley ROBERTS
and Rebecca Roberts,
*Petitioners on Review,*

*v.*

CITY OF CANNON BEACH,
*Respondent below,*
*and*

HAYSTACK ROCK, LLC,
*Respondent on Review.*

(LUBA 2023-066) (CA A184314) (SC S071436)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 5, 2025.

Wendie Kellington, Kellington Law Group P.C., Lake Oswego, argued the cause and filed the briefs for petitioners on review. Also on the briefs were Sara Kobak and Garrett H. Stephenson, Schwabe, Williamson & Wyatt, P.C., Portland.

William L. Rasmussen, Miller, Nash LLP, Portland, argued the cause and filed the brief for respondent on review. Also on the brief were Steven G. Liday and Iván Resendiz Gutierrez.

Bill Kloos, Eugene, filed the brief for *amici curiae* Western Oregon Builders Association and Environ-Metal Properties, LLC.

Jayme Pierce, League of Oregon Cities, Salem, filed the brief for *amici curiae* League of Oregon Cities and Association of Oregon Counties.

_____
   * On judicial review from a final order of the Land Use Board of Appeals. 334 Or App 762, 557 P3d 1143 (2024).

Eric Wriston, Portland, filed the brief for *amici curiae* Oregon Shores Conservation Coalition, Oregon Coast Alliance, and The Surfrider Foundation.

Andrew Stamp, VF Law, Lake Oswego, filed the brief for *amici curiae* Home Building Association of Greater Portland, Oregon Home Builders Association, OPOA Legal Center, Proud Ground, and Stafford Homes and Land, LLC.

FLYNN, C.J.

The decision of the Court of Appeals is affirmed. The final order of the Land Use Board of Appeals is affirmed in part and reversed in part, and the case is remanded to the Land Use Board of Appeals for further proceedings.

**FLYNN, C.J.**

This land use case arises from consolidated applications to the City of Cannon Beach for approval to develop a house on an oceanfront lot and to develop an adjacent, overgrown public right-of-way in order to provide vehicular access to the house. The right-of-way and lot are located in a landslide hazard zone, and the city code imposes certain land use restrictions in that zone, including that an applicant demonstrate either that there is no geologic hazard or that engineering and construction methods "will eliminate the hazard, or will minimize the hazard to an acceptable level." The dispute before this court arises from a tension between a state statute that requires local standards regulating "the development of housing" to be "clear and objective" and the city's geologic hazards provision, which indisputably includes a subjective component.[1]

Although the city indicated that petitioners' own analysis showed that the proposed road development would increase the landslide hazard at the site, the city did not apply its geologic hazards standards to either the house or the road application, because it concluded that the "clear and objective" requirement precluded it from doing so. The Land Use Board of Appeals (LUBA) agreed with the city's interpretation of that statute, *Roberts v. City of Cannon Beach*, ___ Or LUBA ___ (LUBA No 2023-066, Apr 24, 2024) (*Roberts II*), but the Court of Appeals reversed, *Roberts v. City of Cannon Beach*, 334 Or App 762, 557 P3d 1143 (2024) (*Roberts III*).

We allowed petitioners' petition for review of the Court of Appeals' decision, and we now affirm that decision. The proposed road development in this case would be a public road located on a public right-of-way adjacent to petitioners' property, and developing the proposed road was not one of the city's criteria for approving development of the

---

[1] At the time that the city considered the applications, the "clear and objective" requirement at issue in this case was set out in *former* ORS 197.307(4) (2021). In 2023, the provision was amended and renumbered as ORS 197A.400(1). Since then, both ORS 197A.400(1) and the other provisions of ORS 197A.400 have been amended multiple times. Or Laws 2024, ch 111, § 3; Or Laws 2025, ch 476, § 13. Although the substance remains largely the same, for clarity, we refer to *former* ORS 197.307(4) (2021), which the city and LUBA applied to the applications at issue in this case.

house. Under those circumstances, we conclude that petitioners' proposed road development is not "the development of housing" as that term is used in *former* ORS 197.307(4) (2021), and, thus, that statute's "clear and objective standards" requirement did not preclude the city from applying its geologic hazards standards to the road application. Accordingly, we affirm the decision of the Court of Appeals, which reversed in part and remanded the case to LUBA.

## I.   BACKGROUND

Petitioners, Stanley and Rebecca Roberts, own an oceanfront lot in Cannon Beach, Oregon, overlooking Haystack Rock. The property is located on a steep hillside west of South Hemlock Street, an area known as the "S-curves." The property has no vehicular access, but it is bordered to the south by an undeveloped strip of land known as the Nenana Avenue right-of-way. The right-of-way runs east to west and could provide vehicular access from petitioners' property to Hemlock Street. Respondent, Haystack Rock, LLC, owns property that surrounds petitioners' lot to the north and to the east. That property also abuts the Nenana Avenue right-of-way and sits between petitioners' lot and Hemlock Street.



The Nenana Avenue right-of-way was created by the 1908 Tolovana Park subdivision plat, which laid out lots and blocks separated by streets and avenues, including Nenana Avenue, and dedicated the streets and avenues "to the public for its use as thoroughfares forever." *Roberts II*, ___ Or LUBA at ___ (slip op at 47:12-14). The Nenana Avenue right-of-way is not developed for vehicular access, in part because of its location on a hillside with a 35 percent grade that is part of an active landslide. The right-of-way is vegetated, and access currently is blocked by a guardrail along Hemlock Street.

In the proceeding from which the appeal is taken,[2] petitioners submitted two land use applications that they asked the city to consolidate—an application for a permit to develop a house on the property and an application to develop the Nenana Avenue right-of-way from Hemlock Street to petitioners' property.

Because the proposed dwelling and the right-of-way are located in the city's Oceanfront Management Overlay (OM) Zone, the applications were subject to particular standards under the Cannon Beach Municipal Code (CBMC), including the geologic hazards standards. *See* CBMC 17.100.010 (describing purpose of OM zone); CBMC 17.100.040 (specifying particular standards to which "uses and activities" permitted in the OM Zone are subject). The geologic hazards standards provide, in relevant part, that, when "recommended by the geologic site investigation report, or required by the city manager, an engineering report" must be prepared to address the feasibility of the proposed development and that the applicant bears the burden of proof "to show construction feasibility." CBMC 17.108.040.[3] Of particular significance to this case, the code

---

[2] Petitioners had previously submitted a different development permit application to construct a house on their property and a concurrent permit to develop the right-of-way. The city denied that house application, without addressing the right-of-way permit, because the size of the proposed house was larger than the city's oceanfront setback requirements permitted. That decision is now final. *Roberts v. City of Cannon Beach*, 316 Or App 305, 307, 309, 504 P3d 1249 (2021), *rev den*, 370 Or 56 (2022) (*Roberts I*).

[3] At the time that the permit applications were filed and when the city, LUBA, and the Court of Appeals rendered their decisions, the geologic hazards code was numbered as CBMC 17.50.040. The city renumbered that part of its

specifies that a proposed use will be permitted only where the required reports indicate "that there is not a hazard to the use proposed on the site or to properties in the vicinity" or specify "engineering and construction methods which will eliminate the hazard or will minimize the hazard to an acceptable level." *Id*.

Petitioners submitted geotechnical engineering reports for the proposed dwelling and for two alternative proposals for developing the Nenana Avenue right-of-way— one an elevated, bridge-like public road and the other an at-grade private "driveway" that depended upon petitioners being granted an easement by the city. Initially, the city's community development director granted conditional approval for the construction of the house and the development of a "driveway," subject to the condition that, prior to any construction activity, petitioners obtain final design approval for any extension of Nenana Avenue or a driveway within the right of way. But the city had failed to provide respondent with notice of its decision and an opportunity to appeal, so LUBA remanded the matter to the city. *Haystack Rock, LLC v. Cannon Beach*, ___ Or LUBA ___ (LUBA No 2022-041, Sept 28, 2022). On remand, the city chose to hold a hearing to determine compliance with the city's land use regulations. Following that hearing, the city denied the applications to develop both the house and Nenana Avenue, on grounds unrelated to the geologic criteria set out in the city's geologic hazards code.

In a decision that addressed applicable code provisions, the city found that the proposed house met most of the applicable development standards, specifically including the requirements for access to a residential lot.[4] But the city found that raised elements of both the proposed

___

code in 2024 as CBMC 17.108.040, but its substance remained unchanged. We therefore refer to the current version of the code in this opinion.

[4] The city's decision cited the *former* Cannon Beach Municipal Code for the requirement that lots developed as residential "abut a street" for at least 25 feet and include two parking spaces that are accessible from a public street. Those same requirements are now set out at CBMC 17.68.010 to 17.68.030 and CBMC 17.60.020. Over respondent's objections, the city determined that the existing, undeveloped right-of-way qualified as a "street" and that petitioners' proposal for access along that right-of-way sufficed so that approval of the road development was not required.

parking area for the house and the proposed development of Nenana Avenue included "structures" that did not meet the "ocean yard" setback requirements. Although the decision ultimately did not apply the geologic hazards standards, the city addressed those standards in some detail. Relying on the report of a geotechnical engineer, the city explained that industry standards for landslide hazards are based on "factors of safety," or "FS." With respect to the proposed development of Nenana Avenue, the city emphasized that petitioners' "own analysis shows that construction of the elevated roadway will actually reduce the FS at the site." The city ultimately concluded that petitioners had not met their burden under the geologic hazards code to show that the geologic hazards will be eliminated or minimized to an acceptable level, but, as indicated, it did not apply that standard to petitioners' permit applications. The city reasoned, and it is undisputed, that its geologic hazards standards require a subjective determination that the engineering and construction methods specified in the petitioners' expert reports "will minimize the hazard to an acceptable level." Thus, the city concluded that it was precluded from applying its geologic hazards standards to petitioners' application to develop the road by the statutory requirement that a local government may adopt and apply only "clear and objective standards" to the "development of housing."

Both parties challenged the city's decision in an appeal to LUBA. LUBA disagreed with the city's bases for denying the development applications, and it remanded for the city to determine whether a vegetation standard applied, but it otherwise affirmed. *Roberts II*, ___ Or LUBA at ___, ___ (slip op at 45:15-16; slip op at 75:12-20). Most pertinent to the issue in this court, LUBA rejected respondent's cross-assignment of error in which respondent contended that the city was required to consider whether petitioners complied with the geologic hazards code provision. LUBA agreed with the city that the legislature's "clear and objective standards" requirement in *former* ORS 197.307(4) (2021) precluded the city from applying its geologic hazards standards to petitioners' application to develop the Nenana Avenue right-of-way. *Roberts II*, ___ Or LUBA at ___ (slip op at 72:12-18). LUBA emphasized that it had not previously addressed whether the

"clear and objective" requirement applies to proposed development of "off-site vehicular access for a proposed residential development," but it concluded that the city had correctly interpreted the phrase "development of housing" as encompassing the proposed road development in this case. *Id.* at ___, ___ (slip op at 65:3-18; slip op at 72:12-18). As a result, LUBA held that the city could not deny petitioners' application for failing to meet the city's geologic hazards standards. *Id.*

Respondent sought judicial review of LUBA's order in the Court of Appeals, raising several challenges to LUBA's decision, only one of which is relevant here.[5] In that challenge, respondent argued that LUBA had erred when it affirmed the city's conclusion that the proposed road development was the "development of housing" and therefore that the city was precluded from enforcing its geologic hazards standards given the subjective aspect of the standards. The Court of Appeals agreed with respondent and reversed LUBA's decision on that point. The Court of Appeals held that the requirement of "clear and objective standards" for land use decisions regarding "the development of housing" did not apply to the city's consideration of the application for land use approval to develop a public road. *Roberts III*, 334 Or App at 776. The court emphasized that its conclusion was "consistent with the principles of home rule and preemption," under which ambiguous state legislation is presumed not to preempt local government powers. *Id*. Petitioners sought, and we allowed, review.

## II. ANALYSIS

As we have indicated, *former* ORS 197.307(4) (2021), renumbered ORS 197A.400(1) in 2023, provided that a "local government may adopt and apply only clear and objective standards, conditions and procedures regulating the development of housing, including needed housing."[6] Here, there

___

[5] Petitioners separately sought judicial review of LUBA's decision to remand for findings relating to a potentially applicable criterion concerning vegetation removal. The Court of Appeals affirmed LUBA's decision in that case in a nonprecedential memorandum opinion, and petitioners did not seek review of that decision. *Roberts v. City of Cannon Beach*, 334 Or App 807 (2024) (nonprecedential memorandum opinion).

[6] The legislature removed the phrase "including needed housing" in 2025. Or Laws 2025, ch 476, § 13. ORS 197A.400(1)(a) currently provides:

is no dispute that the city's geologic hazards standards are not entirely "objective," because they require a subjective determination that the engineering and construction methods used for the right-of-way development will either eliminate or "minimize the [geologic] hazard to an acceptable level." CBMC 17.108.040(A)(3)(b). Thus, the parties focus their arguments on whether the application to develop vehicular access to petitioners' property over the public right-of-way is "the development of housing" for purposes of the requirement in *former* ORS 197.307(4) (2021) that the city apply only "clear and objective" standards in considering the application.

Three circumstances further narrow the scope of the issue before us. First, the dispute in this court has no bearing on whether the city approves the application to develop a house on petitioners' lot; as indicated above, the city found that the access-related requirements for a residential lot were satisfied *even if* the proposals to develop right-of-way on Nenana Avenue were denied, LUBA affirmed those determinations, and respondent has not pursued a challenge to those conclusions in this court.[7] Second, although petitioners proposed alternative ways to develop the right-of-way, only the proposal of a public road remains viable.[8] Finally, as LUBA emphasized, the petitioners' proposed public road would be "off-site vehicular access." *Roberts II*, ___ Or LUBA at ___ (slip op at 65:3-8). LUBA distinguished earlier cases in which it had previously concluded that the "clear and

---

"[A] local government may adopt and apply only clear and objective standards, conditions and procedures regulating:

"(A)  The development of housing; and

"(B)  Tree removal codes related to the development of housing."

[7]  LUBA concluded that the city permissibly interpreted Nenana Avenue as a "street" for purposes of the requirement that residential lots "abut a street" for at least 25 feet, CBMC 17.60.020, and LUBA reasoned that "[t]he fact that the city denied the vehicular access application does not undermine the city's conclusion that the site plan and proposed vehicular access satisfy the parking area standard." *Roberts II*, ___ Or LUBA at ___ (slip op at 49:1-11).

[8]  Shortly before oral argument in this case, the Court of Appeals—in a separate case involving these parties—held that the city lacks the authority to grant a private easement for a driveway on the Nenana Avenue right-of-way, because ownership of the platted street is shared, with each abutting property owner owning from the front of their lot to the mid-point of Nenana Avenue. *Haystack Rock, LLC v. Roberts*, 343 Or App 244, 259, 578 P2d 1235 (2025). That decision is now final.

objective" requirement applied to the standards that local governments use in evaluating proposed streets that will be within a proposed housing development, *i.e.*, development on the applicant's property. *See id*. at ___ (describing and distinguishing cases) (slip op at 64:5 - 65:8). That conclusion is not at issue in this appeal. Accordingly, we address only petitioners' argument that *former* ORS 197.307(4) (2021) precludes the city from applying its geologic hazards standards to an application to develop a public road on land adjacent to the lot on which petitioners plan to construct a house.

Petitioners argue that developing the proposed road on the right-of-way is "the development of housing," at least in this case, because the road is one of the "necessary development components for the creation of functional housing" and because their application to develop the road was consolidated with their application to develop the house. Respondent argues, however, that the proposal to develop the right-of-way was a separate application for development on different property and ultimately subject to approval by the city's public works department under a different provision of the city code.[9] Respondent contends that no provision of the city code governing development of a house on private property requires development of a road on the adjacent public right-of-way, and it emphasizes that both the city and LUBA rejected its arguments to the contrary. But respondent also argues that, even assuming the proposed road development is "necessary" as a practical matter to development of a house on petitioners' property, that does not make petitioners' separate land use application to develop a public road "the development of housing," and it does not constrain the city's ability to apply its geologic hazards standards to regulate the development of a public road.

As is appropriate in a case involving statutory requirements, both parties focus on the meaning of the phrase "development of housing" and whether the legislature intended the "clear and objective" requirement to reach

_____

[9] CBMC 12.36.030 requires that a permit from the public works department is required before "placing or removing any improvement in the street right-of-way." Petitioners do not dispute that the city could condition its approval of the development permits on petitioners separately obtaining approval for the road through the public works process.

an application for development of a public road on land not owned by the applicant. In addition, respondent relies on the proposition that developing and maintaining public roads is a traditional "home-rule" function of municipalities and that statutes should not be interpreted to prevent the exercise of home-rule authority unless that intent is clear. As we will explain, we agree with respondent that developing public roads is a traditional home-rule function of cities, and that context in part informs our ultimate conclusion that petitioners' road permit application is not an application for "the development of housing" as that term is used in *former* ORS 197.307(4) (2021).

Whether petitioners' proposal to develop a public road is "the development of housing," for which the city was constrained to apply only "clear and objective standards," is a question of statutory interpretation, which we analyze using the now familiar framework described in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). Under that framework, "our 'paramount goal' is to give effect to the intent of the legislature as demonstrated by the text, context, and any helpful legislative history." *State v. Giron-Cortez*, 372 Or 729, 736, 557 P3d 505 (2024) (quoting *Gaines*, 346 Or at 171-72); *see also* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible."). In undertaking that analysis, we begin with the text of the statute, in context. *State v. Meiser*, 372 Or 438, 450, 551 P3d 349 (2024).

A.   *Text*

As pertinent here, *former* ORS 197.307(4) (2021) provided:

> "[A] local government may adopt and apply only clear and objective standards, conditions and procedures regulating the development of housing, including needed housing."

The phrase "development of housing" is not defined in the statutes, but it is made up of terms of ordinary usage. In that situation, "we generally presume that the legislature intended the ordinary meaning of the term, for which we often consult contemporaneous dictionaries." *Brown v. GlaxoSmithKline, LLC*, 372 Or 225, 231, 548 P3d 817 (2024).

The Court of Appeals reasoned that the terms, "[by] their plain text, \*\*\* "appear to refer to houses and the process of developing housing, not public roads." *Roberts III*, 334 Or App at 774.

Petitioners accept that roads are not "housing," but they contend that the plain meaning of "*development* of housing" is not limited to the housing itself. (Emphasis added.) According to petitioners, standards "regulating the development of housing" in *former* ORS 197.307(4) (2021) should be understood as including "necessary development components for the creation of functional housing." As a general proposition, that is a plausible interpretation of the phrase. Relevant to the present context, "develop" is a transitive (active) verb that means "cause to increase or improve **:** promote the growth of," "to make actually available or usable," and "to convert ([something, such] as raw land) into an area suitable for residential or business purposes." *Webster's Third New Int'l Dictionary* 618 (unabridged ed 2002). And "housing" is defined as "SHELTER, LODGING" and "dwellings provided for numbers of people or for a community." *Id*. at 1097. Thus, in ordinary usage, the phrase "the development of housing" *could* refer both to the process of making land itself suitable for housing and to making that housing "actually available or usable" by providing access to it.

B.   *Statutory Context*

In context, however, it is more plausible that the legislature did not intend its restriction on city regulation of "the development of housing" to reach the regulation of a public road on an adjacent public right-of-way any time a person seeking to build a home also proposes to make that additional improvement. As this court has explained, statutory context includes, among other things, other provisions of the same statute and other related statutes, as well as the preexisting common law and the statutory framework within which the law was enacted. *State v. Williams*, 374 Or 648, 661, 582 P3d 637 (2025). Our understanding of what the legislature intended in requiring local governments to apply "clear and objective standards, conditions and procedures regulating the development of housing" is informed by other closely related statutes that likewise include the

"clear and objective" requirement. Those include ORS 227.175(4), which applies when cities consider "an application for a housing development," and its counterpart, ORS 215.416(4), which is nearly identical but applicable to counties. Both of those statutes include wording precluding cities and counties from denying "an application *for a housing development* located within the urban growth boundary *if the development complies with clear and objective standards*," including clear and objective design standards contained in the city or county comprehensive plan or land use regulations. ORS 227.175(4)(b)(A) (requirement for cities (emphasis added)); ORS 215.416(4)(b)(A) (requirement for counties (emphasis added)).[10] The legislature added those provisions to ORS 227.175 and ORS 215.416 in 2017, at the same time that it amended *former* ORS 197.307(4) (2017) to apply the "clear and objective" requirement to standards regulating "the development of housing."[11] Or Laws 2017, ch 745, §§ 2, 3, 5. Because those provisions were all part of the same act, we understand the legislature to have intended the "clear and objective standards" to which those statutes refer to be the same "clear and objective standards" that *former* ORS 197.307(4) (2017) required a local government to adopt and apply for the regulation of the "development of housing." The interrelationship between those three statutes also suggests that the legislature intended "conditions and procedures regulating the development of housing" to be similar in scope to the conditions and procedures that a local government applies to "an application for a housing development." And, as we will explain, the ordinary meaning of an application

---

[10] The Court of Appeals considered the possibility that ORS 227.175(4)(b)(A) itself potentially preempted the city's application of its geologic hazards code and rejected that construction. *Roberts III*, 334 Or App at 774. We do not understand that conclusion to be at issue. LUBA identified only *former ORS* 197.307(4) (2021) as preempting the ordinance. *Roberts II*, ___ Or LUBA at ___, ___ (slip op at 66:9-14; slip op at 69:13-19). And petitioners have not relied on ORS 227.175(4)(b)(A) except as context, perhaps because it is challenging to fit a proposed road on adjacent property within the ordinary meaning of "a housing development." *See Webster's* at 1097 ("housing development" refers to "a group of individual dwellings or of apartment houses commonly of similar design and built and leased under one management"). In any event, we consider ORS 227.175(4)(b)(A) only to the extent it provides context for the meaning of *former* ORS 197.307(4) (2021).

[11] Prior to 2017, the "clear and objective standards" requirement applied only to "the development of needed housing." Or Laws 2017, ch 745, § 5.

for "a housing development" does not automatically extend to an application to develop a public road.[12]

As used in the phrase "application for a housing development," the ordinary meaning of "a housing development" refers to a tangible thing—specifically "a group of individual dwellings or of apartment houses commonly of similar design and built and leased under one management." *Webster's* at 1097; *see also Black's Law Dictionary* 857 (10th ed 2014) (defining a "housing development" as "[a] defined area containing many houses that have been built to a certain set of specific standards"); Randolph Quirk *et al*, *A Comprehensive Grammar of the English Language* 246, 253 (1985) (describing the indefinite article "a" as being used with a singular "count" noun, meaning a noun "seen as denoting individual countable entities and not as an undifferentiated mass").

Petitioners do not contend that their application to develop a road is, itself, an application for "a housing development" as that term is used in ORS 227.175(4)(b)(A). And we are persuaded that the ordinary usage of that term does not reach an application to develop a public road beyond the borders of the property on which the housing is located, at least when the city does not require development of the proposed road as a condition of approval for a housing development.[13]

In addition, as the Court of Appeals observed, several specific provisions in those interrelated statutes support the conclusion that, when the legislature used the phrase "the development of housing," it had in mind the housing itself. For instance, *former* ORS 197.307(4)(a) (2021) expressly called out

_____

[12] The parties agree that it is not uncommon for a local government to condition land use approval for a housing development on the creation of public infrastructure that requires approval through a separate process, such as the public works process for public roads in Cannon Beach. Petitioners do not ask us to conclude that the "clear and objective standards" requirement constrains a city's authority to regulate those separate processes applicable to infrastructure, and that question is not before us.

[13] The issue whether *former* ORS 197.307(4)(a) (2021) and ORS 197A.400(1) would require the city to apply only clear and objective standards to an application to develop a public road in circumstances where city *does* require development of the road as a condition of approval for a housing development is not before the court and we do not address it in this opinion.

"provisions regulating the density or height of a development" as examples of the "standards, conditions and procedures" to which the clear and objective standards applied. Similarly, the 2017 amendments to ORS 227.175(4) and ORS 215.416(4) specifically added limits on the local government's ability to reduce the "density" or "height" of a proposed "housing development." ORS 227.175(4)(c), (d); ORS 215.416(4)(b)(c), (d); Or Laws 2017, ch 745, §§ 2, 3. Although not dispositive of legislative intent, the statutes' express listing of characteristics related to the proposed housing itself, without any mention of roads or other development on adjacent land, reinforces our understanding that the legislature used the phrase "the development of housing" to refer to the housing itself.

The context to which petitioners point does not persuade us otherwise. For example, petitioners rely on a definition of "development" in a statute applicable to a different land use provision, as suggesting that the legislature intended *former* ORS 197.307(4) (2021) to reach the development of roads to provide access to proposed housing. The statute on which petitioners rely governs a city's ability to "regulate the development of land" in a city and provides that, "[a]s used in this section, 'development'" includes "creating or terminating a right of access." ORS 227.215(1). Petitioners acknowledge that the quoted definition specifically applies only to a single, unrelated statute. And, of course, "land" clearly encompasses roads in a way that "housing" does not. But petitioners view ORS 227.215 as suggesting that the word "development" generally is understood to encompass "vehicle access." For our purposes, however, it is significant that the legislature did not cross-reference that definition or similarly specify that creating "a right of access" was part of the definition of "development of housing" for purposes of the "clear and objective" requirement. Even if we were to agree that ORS 227.215 *suggests* that the legislature understood "the development of housing" to encompass the development of access, that is not enough to persuade us that the legislature intended to impose the "clear and objective standards" requirement in *former* ORS 197.307(4) (2021) to an application to develop a public road whenever a person proposing to build a house also seeks to improve a public right-of-way on adjacent property.

Petitioners also contend that the legislature's purpose in requiring local governments to apply only "clear and objective standards" to "the development of housing" was to create a "broad prohibition against any unduly burdensome standards and conditions on needed housing." Petitioners point to *former* ORS 197.307(4)(b) (2021), which provided that local regulations "[m]ay not have the effect, either in themselves or cumulatively, of discouraging needed housing through unreasonable cost or delay." They do not argue that the provision applies to either of their applications; indeed the city concluded that petitioners proposed oceanfront residence does not qualify as "needed housing" under the city's comprehensive plan. But petitioners view that provision as evidence "that the legislature intended a 'broad application of the clear and objective standard to [local] regulations that have the ultimate effect of discouraging development of needed housing.'" (Quoting *Roberts II*, ___ Or LUBA at ___ (slip op at 68:3-7)). That provision, they argue, "confirms that [*former*] ORS 197.307(4) [(2021)] is concerned with the 'effect' of discouraging the development of housing." Focusing on that purpose, petitioners contend that we should interpret the requirement that local governments apply only "clear and objective standards" to the "development of housing" as extending to "regulations that do not directly regulate the development of dwelling structures," such as the regulation of "local infrastructure improvements," if the effect of the regulation would "discourage" construction of needed housing.

But the statute does not support that broad proposition. The expressed concern that a city's regulation of "the development of housing" not create "unreasonable cost or delay" for "needed housing" says nothing about whether the legislature intended the "development of housing" to include the development of local infrastructure. Moreover, even a general legislative purpose to promote the development of "needed housing" does not establish that the legislature intended to broadly constrain the ability of local governments to regulate the development of public roads when the text and context of the provision suggest otherwise. *See Burke v. DLCD*, 352 Or 428, 441, 290 P3d 790 (2012) ("[A] statement of legislative findings, without more, is a slim

reed on which to rest an argument that the operative provisions of a statute should be taken to mean something other than what they appear to suggest.").

One final aspect of statutory context informs our conclusion that the legislature did not intend the constraint on local standards "regulating the development of housing" to necessarily constrain the city's regulation of public roads: the city's obligation to promote public safety. As the Court of Appeals observed, under LUBA's interpretation of *former* ORS 197.307(4)(a) (2021), the statute has the effect of interfering with the city's ability to regulate the safety of public roads on public rights-of-way, which is a core function of a city's traditional "home-rule" authority. *Roberts III*, 334 Or App at 776; *see, e.g.*, ORS 221.415 (recognizing "the authority of cities to regulate use of municipally owned rights of way"); ORS 221.916 (authorizing cities to "[p]reserve the streets, lights, side and crosswalks, bridges and public grounds from injury, prevent the unlawful use of the same and regulate their use"); ORS 223.005 -223.105 (giving cities authority to appropriate property for public rights-of-way). Indeed, if a local government does not adequately ensure the safety of its rights-of-way, it could be subject to liability for injury resulting from its mismanagement. As this court stated nearly a hundred years ago in *Hendrickson v. City of Astoria*, 127 Or 1, 7, 270 P 924 (1928), if a city opens a street to public travel, that is an invitation to the public to use that street and sidewalk. If a city "knowingly and negligently permitted such improvements to get into such a condition of repair as rendered them unsafe for public travel, and a traveler thereon without fault on his part is injured by reason of such unsafe condition of the improvement, the city would be liable for such injury." *Id.*; *see also Pritchard v. City of Portland*, 310 Or 235, 237, 796 P2d 1184 (1990) (city can be liable for failing to maintain right-of-way); *Donaca v. Curry Co.*, 303 Or 30, 36-37, 734 P2d 1339 (1987) (county can be liable for unsafe road conditions).

"Home-rule" authority to enact ordinances addressing matters of local concern is granted to cities by Article XI, section 2, and Article IV, section 1(5), of the Oregon Constitution. *Rogue Valley Sewer Services v. City of Phoenix*,

357 Or 437, 445, 353 P3d 581 (2015). As a result, we adhere to a "presumption 'that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law.'" *Schwartz v. Washington County*, 375 Or 227, 238, __ P3d __ (2026) (quoting *Rogue Valley*, 357 Or at 454). Before concluding that an ordinance promulgated under a city's constitutional home-rule authority is preempted by state legislation, the party advocating for preemption must persuade us that the legislature "unambiguously" expressed that intent. *Owen v. City of Portland*, 368 Or 661, 668, 497 P3d 661 (2021) (internal quotations omitted). For example, in *Owen*, we rejected an argument that a statute barring any local law that "controls the rent" should be understood to preempt a local law that "exercises influence" over the rents, "[p]articularly when considered in light of our cases holding that state law can preempt home-rule authority only when, and to the extent that, the party urging preemption can demonstrate that 'the legislature unambiguously expressed its intent ***.'" *Id*. at 668-69, 675 (quoting *Rogue Valley*, 357 Or at 454).

Although the limitation that *former* ORS 197.307(4) (a) (2021) imposes on a city's authority to regulate "the development of housing" does not entirely foreclose regulation, it would, if applied to every voluntary development of a public road that a developer contends would promote access to housing, significantly constrain local authority to regulate the safety of public roads—a core home-rule function. We have already explained that the statutory text and context do not point to a legislative intent that the phrase "development of housing" encompass the development of public roads. And, "[p]articularly when considered in light of our cases holding that state law can preempt home-rule authority only when, and to the extent that, the party urging preemption can demonstrate that the legislature unambiguously expressed its intent," we are not persuaded that the legislature intended the "clear and objective standards" requirement to limit a city's ability to regulate public roads on a public right-of-way adjacent to property on which housing will be developed, at least where the city does not make road improvements a condition of approving a housing

development. *See Owen*, 368 Or at 674 (internal quotation marks omitted).

## C.  *Legislative History*

We have explained that we will consider legislative history to the extent that it is "helpful" to our understanding of what the legislature intended. *Giron-Cortez*, 372 Or at 736. Here, the legislative history adds nothing helpful to our understanding of whether the legislature intended "the development of housing" to include the development of public roads. It supports petitioners' general proposition that the legislature was concerned about limiting local regulation that would discourage needed housing, but, for reasons similar to those just discussed, that history does not persuade us that the legislature intended that provision to apply in this context. Petitioners describe *former* ORS 197.307 (1981)—the original enactment of the clear and objective standards requirement—as codifying the "St. Helens Housing Policy," a policy that Oregon's Land Conservation and Development Commission had adopted to address local government practices aimed at excluding low-income housing from their jurisdictions. *See* Exhibit E, House Committee on Environment and Energy, SB 419, Apr 24, 1981. Petitioners point to statements in the St. Helens policy requiring that approval standards and conditions be "clear and objective and *** not have the potential effect of discouraging a needed housing type." *Id*. at 1. However, nothing about those statements addresses whether the legislature intended the phrase "development of housing" itself to encompass the development of public roads. In fact, the policy specifically indicated that a city could condition approval on the development being located on a "street paved to city standards." *Id*. at 4. In short, we agree with petitioners that developing needed housing was a legislative priority, but nothing in the legislative history that petitioners have proffered persuades us that the legislature intended the clear and objective standards requirement for "the development of housing" to reach the development of a public road whenever an applicant proposes to also develop housing on adjacent property, at least when the city does not require the road development for approval of a housing development.

D.  *Application to Petitioners' Arguments*

Based on our examination of the statute, we are not persuaded that an asserted need for access converts the proposed road development to "the development of housing," at least when the city does not require the road development for approval of a housing development. Nor are we persuaded that the road application became "the development of housing" by virtue of petitioners' request that it be consolidated with the application to develop housing on petitioners' lot.

We understand LUBA to have relied on the fact that petitioner's application to develop a public road was "consolidated with other applications for residential development" as a significant factor in its determination that petitioner's road application was subject to the statutory limit on regulation of "the development of housing." *See Roberts II*, ___ Or LUBA at ___ (describing *GPA 1, LLC v. City of Corvallis*, 73 Or LUBA 339, 350-51, 357-58 (2016), a case in which LUBA held that a stand-alone application to construct a road "necessary" to develop "needed housing" was not itself "the development of" needed housing and distinguishing it on the basis that the road application in *GPA 1, LLC* "was not consolidated with other applications for residential development") (slip op at 63:12 - 64:4). But petitioners have not contended that they were required to consolidate their road application with the house application. Indeed, petitioners explained at oral argument that they submitted the road application along with the house application simply "to make sure that the city had enough information" to be able to decide that the standards governing "the development of this housing" application were met.

If LUBA and petitioners are correct that the fact that the applications were consolidated means that the proposed road improvements are the "development of housing," then it would be the applicant's choice to combine applications that determines whether a city is constrained by *former* ORS 197.307(4) (2021) in its evaluation of the geologic safety of a proposed road development. We do not agree.

First, whether the applications were filed together or at different times does not affect our understanding of

the phrase "development of housing." As LUBA stated in *GPA 1, LLC*, "[a] road is simply not a 'housing type[;]' it is a road." 73 Or LUBA at 357 (second brackets in original). We have already explained that our examination of the text and context of *former* ORS 197.307(4) (2021) does not persuade us that the legislature intended the phrase "development of housing" to include development of a public road on an adjacent public right-of-way. The fact that the application to develop a public road was filed together with an application to build a house does not convert the application to develop the public road into an application for "the development of housing." Second, as discussed, the city, applying its geologic hazards code, found that petitioners' proposed development of a road on the Nenana Avenue right-of-way would not minimize the geologic hazards of the landslide area to an acceptable level and, in fact, would increase the existing risk. In other words, the city found that the proposed right-of-way would be unsafe. Nothing in the text or context of *former* ORS 197.307(4) (2021) persuades us that the legislature intended petitioners' choice regarding the timing of their application to develop the public road to be the factor that dictates whether the city must ignore its safety standards applicable to the geologic hazard presented by the proposed public road.

### III.   CONCLUSION

In sum, our review of the text, context, and legislative history of *former* ORS 197.307(4) (2021) does not persuade us that the legislature intended its limitation on local regulation of "the development of housing" to reach the circumstances here, "[p]articularly when considered in light of our cases holding that state law can preempt home-rule authority only when, and to the extent that, the party urging preemption can demonstrate that the legislature unambiguously expressed its intent * * *." *See Owen*, *368* Or at 674 (internal quotation marks omitted). On the contrary, we have concluded that, in requiring that a local government apply "clear and objective standards" to regulations concerning "the development of housing," the legislature intended that requirement to apply to the construction of housing and not to the construction of public roads on a public right-of-way, at

least when, as here, the city does not require the road development for approval of a housing development. Accordingly, we conclude that the city and LUBA incorrectly construed *former* ORS 197.307(4) (2021) as precluding the city from applying the geologic hazards standards of its land use code to petitioners' application to develop a public road.

The decision of the Court of Appeals is affirmed. The final order of the Land Use Board of Appeals is affirmed in part and reversed in part, and the case is remanded to the Land Use Board of Appeals for further proceedings.